## CHRISTIANSON et al. v. CHAMPLIN REFINING CO. et al.

### No. 3616.

Circuit Court of Appeals.

Tenth Circuit.

July 14, 1948.

---

208

Robert G. Braden, of Wichita, Kan. (W. D. Jochems, J. Wirth Sargent, Emmett A. Blaes, Roetzel Jochems, all of Wichita, Kan., on the brief), for appellants.

E. S. Champlin, of Enid, Okl., and Mark H. Adams, of Wichita, Kan. (Harry O. Glasser and Nathan Scarritt, both of Enid, Okl., Charles E. Jones, of Wichita, Kan., William I. Robinson, of Tulsa, Okl., and J. Ashford Manka, of Wichita, Kan., on the brief), for appellees.

Before PHILLIPS, HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

The sole question in this case is whether the inability of an oil operator to connect a producing gas well to a pipe line and thus market the gas within a short time after the drilling of a well works a forfeiture of a lease which provides that: "It is agreed that this lease shall remain in force for a term of ten years from this date, and as long thereafter as the lessee produces oil and gas, or either of them, from said land or the premises are being developed or operated."

and, "For an additional and further consideration of One Dollar, Cash in hand paid, receipt of which is hereby acknowledged, and notwithstanding anything in this lease to the contrary, it is expressly agreed that if lessee shall commence drilling operations at any time while this lease is in force, then this lease shall remain in full force and its term shall continue so long as such operations are prosecuted and, if production results therefrom, then as long as production continues."

The facts in this case are not in dispute and from the findings made by the court, they may be summarized as follows.

The appellees were the owners of an oil and gas lease on the premises in question. On the last day of the primary term, they started the drilling of a well on the premises and continued the operations until May 23, 1945, when a sour gas well in commercial quantities was brought in. The cost of this well was $25,000. The well was located approximately thirteen miles from an available gas pipe line. A number of sour gas wells had been drilled in the vicinity of the lease. Two of these wells were completed in the year 1941, and three in the year 1945. Due to want of pipe line connections, none of these wells had been able to obtain an available market for the gas produced therefrom.

Upon the completion of this well, the appellees diligently contacted the only companies taking gas into their pipe lines in the vicinity of the well; but owing to the necessity of building a new pipe line a distance of over ten miles, none of these companies would purchase the gas. The approximate cost for the construction of such a line at that time was $75,000. The marketing of this gas was made more difficult due to its high sulphur content. The cost of constructing the line made it uncon-

omical for the appellees to construct a pipe line, and their expenditures of this sum was not justified.

The appellees with due diligence continued their effort to secure a market until May 27, 1946, when a purchaser was secured. The well was connected with a pipe line of the purchaser on August 19, 1946. Prior thereto, on June 1, 1946, and before the filing of this suit for the cancellation of the lease and the clearing of the title on June 5, the appellants were informed of the contract for the sale of the gas.

The purchaser has been taking the gas and paying therefor since August 19, 1946. Appellants accepted their portion of the royalties from the gas production during the period August 19, to August 26, 1946, but have not executed a division order. They also granted an easement upon the land involved, together with other premises, for the purpose of the construction of the pipe line to the well in question.

In October, 1946, the well began making oil and from that date through March, 1947, has produced 2,110.36 barrels of oil. During the time in question there was no production of either oil or gas upon adjacent land that caused or might cause a drainage of any portion of the leasehold. On April 11, 1946, appellants gave notice to the appellees of forfeiture of the lease for failure to produce in paying quantities and demanded a surrender of the lease and evidence of such surrender by recorded release. Upon failure to comply with their demand, they instituted this action seeking a cancellation of the lease. They have appealed from a judgment adverse to them.

Appellants' position is that under the laws of Kansas, a lease which depends upon production for its continued existence after the primary term must be produced, or if there is a temporary cessation of production, the definite, temporary character of such cessation of production must appear in order to keep the lease from terminating according to the express terms. In other words, their position is that when an oil or gas well is brought in, it is necessary for the producer to immediately market the oil or gas, and that failure to immediately obtain a market therefor does not excuse failure to market the oil or gas and ipso facto terminates the lease.

It is agreed by the parties that there is no case in Kansas which has squarely passed upon this question. There are a number of analogous cases upon which appellants rely. Without analyzing them in detail, it is sufficient to say that they are all cases in which drilling operations resulted in a producing well and in which the oil or gas therefrom was marketed and sold during a period of time and thereafter production was stopped. In some of these cases, production ceased because it was unprofitable; the casing was withdrawn from the well and no further efforts were made to produce the well. In other cases where the well was not abandoned, the court held that forfeiture resulted from the peculiar and particular wording of the lease involved.

■ The general rule is that where production results from drilling operations and the operator is unable to market the product immediately on account of lack of an available market or of pipe line connections, no forfeiture results if, by the exercise of due diligence on the part of the operator, the well is equipped and a market is obtained within a reasonable time.[1]

The case of Kahm v. Arkansas River Gas Company, 122 Kan. 786, 253 P. 563, 564, upon which appellants place strong reliance, is of no avail to them. In that case a well had been drilled and equipped and had produced large quantities of gas over a considerable period of time, with the result that the royalty holders received substantial royalty payments for a number of months. The gas flow gradually declined and eventually ceased altogether and the well was disconnected from the pipe line. This condition continued for six months during which time the owners of the lease attempted, without avail, to secure a new market for such gas as the well might then produce, and in their answer in the suit which fol-

---

[1] Severson v. Barstow, 103 Mont. 526, 63 P.2d 1022; Stimson v. Tarrant, 9 Cir., 132 F.2d 363; Steven v. Potlatch Oil & Refining Co., 80 Mont. 239, 260 P. 119, Berthelote v. Loy Oil Company, 95 Mont. 434, 28 P.2d 187; Pennagrade Oil & Gas Co. v. Martin, 211, Ky. 137, 277 S.W. 302; Strange v. Hicks, 78 Okl. 1, 188 P. 347.

lowed, alleged that it was then "working on the Kahm well to see if there is any way to rehabilitate it * * *." The opinion was predicated on the fact that production had wholly ceased with no immediate prospect of its restoration. The court clearly indicated that its conclusion would have been otherwise in the event of a temporary cessation. Thus, the court said: "It is argued that a mere temporary suspension of gas production from a well for any one of a variety of possible causes would not warrant the summary cancellation of a lease thereon. Probably not. But here it was no mere temporary suspension of production * * * ."

The decision indicates that forfeiture would not result where a well commenced during the primary term and finished after the expiration thereof was not immediately placed in production if the operator moved with due diligence, and within a reasonable time obtained a market for the product of the well.

The latest expression by the Supreme Court of Kansas on the general subject is found in Wilson v. Holm, 164 Kan. 229, 188 P.2d 899. In this case, as well as in other Kansas cases, the precise question was not involved but throughout the opinion the court stresses the distinction between temporary cessation of production and a permanent shutdown. The decision granting a forfeiture of the lease in question in the Holm case rested on the ground that the well had been abandoned for want of production, but the court quite clearly indicates that temporary suspension of production is no ground for forfeiture. Thus the court, in Syllabus 6, said: "Temporary cessation of production because of necessary developments or operation does not result in a termination of rights acquired by the grantees."

and, "If for any reason there is a cessation of production of oil in paying quantities from the land described in the conveyance the owners of the minerals in place are required to move promptly and by their efforts actually establish that such cessation, regardless of its cause, is temporary, not permanent. In the event of their failure to do so the production contemplated by the deed is to be regarded as at an end."

 It is implied in the very nature of the oil business that a reasonable time must intervene between the completion of the drilling operations resulting in production and the ability to market and sell the product of a well. What constitutes a reasonable time, of necessity, depends upon the circumstances surrounding the drilling of each well. Thus, a wildcat well, a considerable distance from pipe line connections and markets, cannot be actually produced in the sense that the product is marketed within the same length of time as a well that is close to such facilities. All that is required is that the operator exercise due diligence in equiping the well and in placing it in production. This is the general rule and there is nothing in the Kansas decisions which have come to our attention which would indicate a contrary holding. Certainly the appellees in this case did all that reasonable men could be expected to do. They did secure within a year the construction of an expensive pipe line and made it possible to market the gas which was of an inferior quality, which in itself, entailed additional difficulty, and were actually marketing the gas from the well within fifteen months from the date of its completion.

Affirmed.